THE PEOPLE OF THE STATE OF NEW YORK ex rel. THE MANHATTAN RAILWAY COMPANY, Appellant, *v.* EDWARD P. BARKER et al., as Commissioners of Taxes and Assessments of the City and County of New York, Respondents.

1. TAX — REVIEW OF ASSESSMENTS — L. 1880, CH. 269. While the writ prescribed by the act "for the review and correction of illegal, erroneous or unequal assessments" (L. 1880, ch. 269) may be a writ of review and, hence, properly called a writ of certiorari, it may also be in the nature of a *venire de novo*.

2. APPEAL — CONSTITUTION, ART. 6, § 9 — UNANIMOUS DECISION OF APPELLATE DIVISION. *It seems*, that the provision of the Constitution (Art. 6, § 9), that "no unanimous decision of the Appellate Division of the Supreme Court, that there is evidence supporting or tending to sustain a finding of fact, * * * shall be reviewed by the Court of Appeals," applies to special proceedings as well as to actions, and to implied findings as well as to those written out *in extenso*.

3. PROCEEDING TO REVIEW ASSESSMENT. The restriction imposed by the Constitution upon the review of a unanimous decision of the Appellate Division, that there is evidence supporting a finding of fact, applies to an order of affirmance in a statutory proceeding to review an assessment, in which a trial *de novo* has been had at Special Term, upon new

evidence, as to the value of the relator's property, resulting in a confirmation of the assessment and a dismissal of the writ of certiorari.

4. Unanimous Affirmance — Findings of Fact. The effect of a unanimous judgment or order of affirmance by the Appellate Division is a decision that there is evidence supporting the findings of fact as expressed or necessarily implied. It is not necessary for that court to specify what findings of fact are sustained by evidence, when it intends to sustain them all, or to repeat the language of the Constitution and apply it generally to all the findings of fact.

5. Elevated Railroad — Assessment — Annual Report as Evidence. The annual report of an elevated street railroad company to the state railroad commissioners is competent evidence, as in the nature of an admission, for the assessing officers to act upon in assessing the company under the act "in relation to the assessment of taxes on incorporated companies" (L. 1857, ch. 456), and for the Special Term in reviewing the assessment.

6. Railroad Lease — Franchise. The lease of a railroad necessarily includes the use of the franchise of the company owning it, and the cost of such lease necessarily embraces to some extent the value of the franchise.

7. Taxation of Franchise. Franchises cannot be included in an assessment made under chapter 456, Laws of 1857.

8. Erroneous Assessment of Cost of Leases. It is erroneous to include in the basis of assessment against an elevated railroad company under chapter 456, Laws of 1857, the cost of leases of roads operated by it, without deducting the value of the franchises included in the leases.

*People ex rel. Manhattan R. Co.* v. *Barker,* 6 App. Div. 356, reversed, etc.

(Argued October 20, 1896; reargued February 2, 1897; decided April 20, 1897.)

Appeal from an order of the Appellate Division of the Supreme Court in the first judicial department, entered June 8, 1896, which unanimously affirmed an order of Special Term dismissing a writ of certiorari and confirming an assessment against the capital and surplus of the relator.

This is a special proceeding instituted to review an assessment made upon the personal estate of the relator for the year 1895, pursuant to section 3, chapter 456 of the Laws of 1857.

It was founded on a petition in which the relator alleged that its gross assets, aside from its franchises, amount to $26,587,816, and that its indebtedness largely exceeds that sum; that the commissioners, through improper methods and

assumptions, had valued the gross assets at $73,884,595; that from the payment of a dividend and the existence of a surplus they assumed that the capital of the relator was unimpaired; that from the fact of unimpaired capital they inferred that the value of the assets was at least equal to the amount of the share stock at its par value, together with the surplus and indebtedness, and that they then assumed that the relator had assessable assets to the said amount of $73,884,595. The petition further specified the following grounds of error and illegality:

"(1) That said commissioners assumed to take as the value of the real and personal estate of your petitioner, subject to assessment, the total par value of its shares of capital stock, plus the amount stated by your petitioner as surplus earnings and an amount equal to its outstanding indebtedness; that such assumptions on the part of said commissioners were erroneous and illegal.

"(2) That, inasmuch as the said commissioners were fully informed of the actual value of all the assessable assets of your petitioner, the par value and the market value of the shares of stock issued to stockholders was immaterial and could not lawfully form or be taken as the basis of assessment, as was attempted to be done by the commissioners.

"(3) That said commissioners were fully informed of the nature and meaning of said statement of an amount as 'surplus earnings,' and knew that the same did not constitute and could not be taken as a surplus, within the meaning of the term as sought to be used by said commissioners, viz., in the sense of a fund or amount over and above an unimpaired capital, but that they nevertheless proceeded upon the assumption that it bore such meaning.

"(4) That said commissioners did not deduct from the sum arrived at by them as the value of the assets of your petitioner on the second Monday of January, 1895, the indebtedness of your petitioner outstanding upon that day, and that said commissioners disregarded said indebtedness in arriving at their pretended assessment of your petitioner.

420  People ex rel. Manhattan R. Co. *v.* Barker. [April,

Statement of case.                     [Vol. 152.

" (5) That said commissioners by their pretended assessment have attempted to assess as taxable assets the franchises of your petitioner; that no deduction has been made by them from the total value of the assets of your petitioner for the value of said franchises; and said commissioners have assumed that the taxable assets of your petitioner are equal in value to a sum which is composed of the value of both the taxable and non-taxable assets of your petitioner.

" (6) That said commissioners in their pretended assessment have disregarded the uncontradicted and unimpeached evidence of your petitioner, and have attempted to assess your petitioner for its personal property or capital stock and surplus profits without evidence, and in disregard of the facts."

It appears by the return of the commissioners that they assessed the personal property of the relator for the year 1895, exclusive of bank shares, at the sum of $30,000,000, and thereupon gave the usual notice. Upon grievance day the relator appeared before the commissioners and asked for a reduction or cancellation of the assessment against it, and in support of such application filed a statement and certain affidavits and examined one witness orally. The commissioners examined into the complaint made by the relator, considered its application and the evidence submitted in support thereof, and fixed the amount of the assessment at the sum of $16,496,995, which, as they certify, " they believe to be just, and which they decide to be the sum for which the personal property of the relator was lawfully assessable for the year 1895."

They further returned that the method by which they made their assessment was as follows : " They had before them, and considered a certain report made by the officers of the Manhattan Railway Company to the railroad commission, which report was transmitted to the legislature on the 2d day of January, 1895, and which they were advised and believed was competent evidence to be considered by them, and that any statements therein contained were to be treated by them as admissions made by the relator; that in said report the

1897.] People ex rel. Manhattan R. Co. v. Barker. 421

N. Y. Rep.]                     Statement of case.

relator itemized its total gross assets, and fixed them at the sum of $72,787,217.13, and reported its liabilities at the sum of $37,164,019.10, leaving the said relator, at the time that the said report was made, as we ascertained from the said report, possessed of actual tangible assets, over and above its liabilities, in the sum of $35,623,197.38. They further ascertained, from said report, that the relator stated its capital stock at the sum of $30,000,000, and an existing surplus on the 30th day of June, 1894, in the sum of $5,623,197.38, so that they concluded they were justified in determining that the relator, at the date of said report, was possessed of actual tangible assets, over and above all liablilities, in the sum of $35,623,197.38. The commissioners had before them also, and considered, a statement filed with them by the above-named relator, upon its application for a reduction and cancellation of the assessment against it for the year 1893, and the commissioners were further advised and informed by the records in their office had upon that application, that it then admitted its liability to, and assented to an assessment against, its personal property in the sum of $12,529,915. The commissioners had also before them the application filed by the relator for a reduction and cancellation of the assessment against its personal property for the year 1894, and of all the proceedings had thereon, and ascertained and determined that the statement made in 1893 and the statement made in 1894 disclosed no substantial difference in the condition of the relator for purposes of assessment against its personal property, with the exception that the amount of surplus disclosed in 1894 was nearly $1,000,000 in excess of that reported in 1893. * * * They further ascertained, on the examination hereinbefore referred to, that the statement made by the Manhattan Railway Company to the New York railroad commissioners hereinbefore referred to was a true statement; that the traffic of the company between June 30, 1894, and the second Monday of January, 1895, yielded a profit above operating expenses and fixed charges." They "further ascertained and determined the fact to be that the capital stock paid in, as

returned by the relator at the sum of $30,000,000, represented money, or its equivalent, actually paid for real estate and the building, construction and equipments of the elevated roads of the relator, and that either money or its equivalent had been invested in such real estate amounting to the sum of $49,072,807.25, and that such sum represented the actual value of the real estate of the relator and represented property over and above the value of any franchises owned by the relator, and that the capital stock of the relator remained unimpaired." They "further ascertained and determined that, notwithstanding the claim of the relator that the sum returned by it as the amount of surplus earnings at the sum of $5,407,995 did not, in fact, represent the sum composed of assets realized from profits remaining undivided and subject to division at the option of the directors, and an additional sum by way of assets to the unimpaired capital of the company; that, nevertheless, the relator had theretofore under the statute claimed the right to have deducted ten per cent of its capital stock, upon the ground that the said sum did represent the surplus referred to in the statute as the sum therein defined as surplus profits or reserved funds exceeding ten per cent of its capital, after deducting the assessed value of its real estate and all shares of stock in other corporations actually owned by such company. The commissioners, therefore, upon all the facts hereinbefore returned, ascertained and determined the fact to be that the capital stock of the relator paid in or secured to be paid in, to wit, the sum of $30,000,000, remained and was, on the second Monday of January, 1895, unimpaired, and they, therefore, proceeded, as required by statute, to deduct from the capital stock and surplus of the relator, being the sum of $35,407,895, ten per cent of the capital stock, to wit, $3,000,000, the assessed value of the real estate of the relator, $15,910,900, a total of deductions from the capital and the surplus of the relator, $18,910,900, and assessed the actual, tangible assets of the relator, subject to taxation, $16,496,995. * * * With regard to the statements contained in said writ, and the petition upon which the

1897.] People ex rel. Manhattan R. Co. *v.* Barker. 423

N. Y. Rep.]                    Statement of case.

same was granted, to the effect that said assessment is erroneous by reason of overvaluation, or is unequal in that it was made at a higher proportionate valuation than other real or personal property on the same rolls, or that the said assessment upon any of the grounds specified in said petition is illegal, erroneous or void, we certify and return, upon information and belief, that each and every of such statements is untrue."

The return put at issue, by appropriate denials, the allegations of the petition, except as admitted, and the various papers and evidence, aside from actual inspection, were annexed to and made a part of the return.

When the matter came on for hearing before the Special Term an order was made which, after referring to the issues arising from the filing of the return and reciting " that testimony is necessary for the proper disposition of the matter," sent the proceeding to a referee " to take and report to this court  *  *  *  evidence upon the several matters in issue, and particularly as to the following, to wit:

"(1) The actual value of the real estate of the relator, The Manhattan Railway Company, on the second Monday of January, 1895.

"(2) The actual value of the personal property and assets other than real estate and franchises of the relator, The Manhattan Railway Company, on the second Monday of January, 1895."

Said order further directed " that upon the entering of said referee's report this cause be placed by the clerk of this court upon the day calendar for the first Monday following the filing of said report, and that the issues therein be again brought on for trial *de novo* before the justice who may then be holding such Special Term of this court."

The order of reference was duly executed, a good deal of testimony taken, and upon the final hearing, based on the petition, writ, return, referee's report and the evidence taken · before him, it was " ordered that said writ of certiorari be and the same hereby is dismissed, and said proceedings of the respondents herein be and they are hereby in all respects con-

firmed, with costs to the respondents." Upon appeal to the Appellate Division .from the order of the Special Term the same was in all things affirmed. The relator thereupon appealed to this court. As it did not appear from the order of the Appellate Division, as at first entered, whether the decision of that court was unanimous or not, upon a subsequent application it was amended *nunc pro tunc* so as to provide that the closing paragraph of the order of affirmance should read as follows: "It is \* \* \* unanimously ordered and adjudged that the said order be and the same is hereby affirmed, with costs to the respondents."

After the argument of the appeal in tnis court upon the merits, a reargument was ordered upon the question first considered in the opinion. (150 N. Y. 585.)

*Julien T. Davies* and *John F. Dillon* for appellant. The petition presents a case both of illegality and erroneous overvaluation. (*People ex rel.* v. *Barker*, 146 N. Y. 304.) Under the provisions of sections 4 and 5, chapter 269 of the Laws of 1880, the relator was entitled to produce further evidence before the referee, and the testimony taken before the referee is to be considered by the court in the determination of the matter whether the assessment shall be corrected or vacated or whether a new assessment be made. (*People ex rel.* v. *Gray*, 45 Hun, 243; *People ex rel.* v. *Palmer*, 86 Hun, 513; *People ex rel.* v. *Smith*, 24 Hun, 71.) This court has already decided in favor of the relator every question involved in this case except such questions as may arise from the consideration of the report of the relator to the railroad commissioners for the year ending June 30, 1894. (*People ex rel.* v. *Barker*, 146 N. Y. 304.) The relator furnished to the commissioners all the evidence required by the statute and all required by the commissioners themselves. (1 R. S. 414, § 2.) The report to the railroad commissioners is not sufficient proof, taken by itself, of the value of relator's property, and taken in connection with the testimony, wholly fails to sustain the assessment. (*People ex rel.* v. *Coleman*, 126 N. Y. 433;

1897.] People ex rel. Manhattan R. Co. *v.* Barker. 425

N. Y. Rep.]                     Points of counsel.

*Boreel* v. *Mayor, etc.,* 2 Sandf. 552; *Smith* v. *Mayor, etc.,* 68 N. Y. 555; L. 1881, ch. 293; L. 1896, ch. 908, art. 1, § 2.) The tax commissioners in making an assessment cannot disregard the evidence before them or proceed arbitrarily, but must come to a determination in accordance with the facts proved before them. (*People ex rel.* v. *Barker,* 139 N. Y. 55; *People ex rel.* v. *Barker,* 141 N. Y. 251; *People ex rel.* v. *Dykes,* 45 N. Y. S. R. 621; *People ex rel.* v. *Coleman,* 126 N. Y. 433; *People ex rel.* v. *Barker,* 144 N. Y. 94.) The facts that a corporation pays a dividend and possesses surplus earnings do not authorize the commissioners to disregard indebtedness and to treat the capital as unimpaired in the sense of being equaled by visible, tangible property liable to taxation, because, *first,* both surplus earnings and dividends are the results of the earning power not only of the visible, tangible property of the corporation, but of the franchises; and, *second,* the franchises of the corporation are not taxable through the system of taxing its capital stock. (*People ex rel.* v. *Barker,* 144 N. Y. 638; *People ex rel.* v. *Comrs. of Taxes,* 104 N. Y. 240; *People ex rel.* v. *Barker,* 146 N. Y. 306.) The value of the real estate of the character of the relator's structures in the streets is to be fixed for the purposes of assessment and taxation at not exceeding the cost of replacement, with proper allowances for deterioration from wear and tear. (*M. R. Co.* v. *Mayor, etc.,* Daily Reg., Oct. 20, 1884; *People ex rel.* v. *Dolan,* 126 N. Y. 166.) However conclusive the judgment of taxing officers as to the valuation of property may be when that judgment is honestly exercised and proceeds upon correct principles, it is well-settled law that no assessment can stand when the principles upon which it is made are illegal; and, under the act of 1880, the decisions of the taxing officers are reversible on the merits. (*People ex rel.* v. *Barker,* 139 N. Y. 55; 139 N. Y. 251; *People ex rel.* v. *Dykes,* 45 N. Y. S. R. 621; *People ex rel.* v. *Coleman,* 126 N. Y. 433; *People ex rel.* v. *Barker,* 146 N. Y. 304; *People ex rel.* v. *Gray,* 45 Hun, 243; *People ex rel.* v. *Palmer,* 86 Hun, 513; *People ex rel.* v. *Smith,*

24 Hun, 71.) The record in this case presents questions of method or of principle, not findings of fact. (*People ex rel. v. Nichols,* 79 N. Y. 592; L. 1880, ch. 269; *People ex rel. v. Comrs. of Taxes,* 64 N. Y. 543; *People ex rel. v. Barker,* 146 N. Y. 312; *People ex rel. v. Zoll,* 97 N. Y. 207; Code Civ. Pro. §§ 2140, 2147; *People ex rel. v. Low,* 40 Hun, 176; *People v. Coleman,* 18 Abb. [N. C.] 246; Wood on Certiorari [2d ed.], 166, 167; *People ex rel. v. Smith,* 45 N. Y. 772; *People ex rel. v. Bd. Fire Comrs.,* 106 N. Y. 257.) If the Appellate Division is charged with the duty of determining whether any rule of law has been violated to the prejudice of the relator, and does determine that question in the negative, and such determination is brought into this court for review, the question is lawfully here and must be passed on because it is involved in the determination of the court below and is not excepted from the jurisdiction of this court. (*People ex rel. v. Board of Assessors,* 39 N. Y. 81; *People ex rel. v. Board of Police,* 39 N. Y. 506; *Swift v. City of Poughkeepsie,* 37 N. Y. 511; *People ex rel. v. Assessors of Albany,* 40 N. Y. 154; *People ex rel. v. Smith,* 45 N. Y. 772; *People ex rel. v. Davenport,* 91 N. Y. 581; *People ex rel. v. Barker,* 139 N. Y. 658; *People ex rel. v. Barker,* 141 N. Y. 255; *U. S. T. Co. v. Mayor, etc.,* 144 N. Y. 491; *People ex rel. v. Barker,* 144 N. Y. 94; *People ex rel. v. Barker,* 146 N. Y. 312.) The constitutional provision applies only to express findings of fact, not to rulings implied in a mere direction for judgment, nor to determinations of assessing officers. (Const. N. Y. art. 6, § 9; Code Civ. Pro. § 191, subd. 4; L. 1895, ch. 946; Endlich on Interp. of Statutes, §§ 151, 522; Black on Interp. of Laws, § 55; Suth. on Stat. Const. §§ 395, 396; *Matchett v. Lindberg,* 2 App. Div. 340; *Newell v. People,* 7 N. Y. 9; *Gibbons v. Ogden,* 9 Wheat. 1; *Beardstown v. Virginia,* 76 Ill. 34; Cooley's Const. Lim. (4th ed.) 73, 74; *Otten v. M. R. Co.,* 150 N. Y. 395; Code Civ. Pro. §§ 993, 997; *In re Smith,* 146 N. Y. 68; *People ex rel. v. Comrs. of Land Office,* 149 N. Y. 26; *People ex rel. v. N. Y. Produce Exchange,* 149 N. Y.

1897.] People ex rel. Manhattan R. Co. *v.* Barker. 427

N. Y. Rep.]　　　　　　Points of counsel.

401; *In re Haebler* v. *N. Y. Produce Exchange,* 149 N. Y. 414.) The constitutional provision in question applies only to rulings upon pure questions of fact, not to rulings upon questions of commingled fact and law. (*Smith* v. *Smith,* 18 Civ. Pro. Rep. 28; *Welsh* v. *M. El. R. R. Co.,* 29 N. Y. S. R. 511; *In re Fithian,* 25 N. Y. S. R. 556.) The record in this case does not certify or state the propositions upon which the Appellate Division was unanimous, nor does it show that that court unanimously determined that evidence existed supporting or tending so sustain any finding of fact. (Const. N. Y. art. 6, § 9; Code Civ. Pro. §§ 190, 191, 1324; *Batterman* v. *Finn,* 40 N. Y. 340; *People ex rel.* v. *Fowler,* 55 N. Y. 675; *State* v. *Kings Co.,* 125 N. Y. 312; *Hoes* v. *Edison G. E. Co.,* 150 N. Y. 87; *People ex rel.* v. *Cullen,* 151 N. Y. 56; *Gaffney* v. *People,* 50 N. Y. 416; *People* v. *Casey,* 72 N. Y. 393; *Salmon* v. *Gedney,* 75 N. Y. 479; *Reese* v. *Boese,* 92 N. Y. 632; *Kilmer* v. *N. Y. C. & H. R. R. R. Co.,* 94 N. Y. 495; *Scott* v. *Morgan,* 94 N. Y. 508; *Koehler* v. *Hughes,* 148 N. Y. 507; *Rosenstein* v. *Fox,* 150 N. Y. 354; *Kaplan* v. *N. Y. B. Co.,* 151 N. Y. 171.)

*Francis M. Scott* and *James M. Ward* for respondents. The appellant has established beyond peradventure that it was, on the second Monday of January, 1895, possessed of a surplus composed of assets realized from profits remaining undivided and subject to division at the option of the directors and being additional to the assets which constituted its unimpaired capital on that date. (*People ex rel.* v. *Coleman,* 126 N. Y. 437; 146 N. Y. 314.) The commissioners of taxes have not contravened anything decided in the cases of *People ex rel.* v. *Barker* (139 N. Y. 55); *People ex rel.* v. *Barker* (141 N. Y. 196); *People ex rel.* v. *Barker* (141 N. Y. 251); 1 R. S. 601, § 2. Where there is any evidence to justify a finding of fact by the commissioners, the court will not review their determination. (*People ex rel.* v. *Barker,* 48 N. Y. 77; *People ex rel.* v. *Comrs. of Taxes,* 76 N. Y. 64; *People ex rel.* v. *Davenport,* 91 N. Y. 574; *People ex rel.* v. *Asten,* 100

N. Y. 597; *People ex rel.* v. *Barker*, 144 N. Y. 94; *People
ex rel.* v. *Barker*, 147 N. Y. 31.) It is the intention of the
statute that all the property of the corporation shall be assessed
to its aggregate actual value, and that so much thereof as
would otherwise escape taxation, by reason of undervaluation
of realty, shall be assessed as capital under head of personalty.
(*People ex rel.* v. *Comrs. of Taxes*, 104 N. Y. 249; *People
ex rel.* v. *Barker*, 144 N. Y. 94.) The mode of assessment
pointed out ·by the statute has been strictly followed by the
commissioners, and no error in their proceeding is shown by
the return. (1 R. S. [8th ed.] tit. 4, chap. 13, p. 1149;
*People ex rel.* v. *Comrs..of Taxes*, 95 N. Y. 561; *People ex
rel.* v. *Coleman*, 126 N. Y. 433.) In the absence of proof
furnished by the appellant as to the net value of its assets,
the respondents had power to act upon their own judgment
or knowledge in determining the value of the relator's assets.
(*People ex rel.* v. *Comrs. of Taxes*, 76 N. Y. 64; *People ex
rel.* v. *Baker*, 48 N. Y. 77; *People ex rel.* v. *Davenport*, 91
N. Y. 574; *People ex rel.* v. *Asten*, 100 N. Y. 597; *People
ex rel.* v. *Barker*, 144 N. Y. 94.) The deduction of the
assessed value of the realty from the value of the assets of
the company in excess of its debts is the deduction which the
statute requires to be made in fixing the assessment for capi-
tal. (*People ex rel.* v. *Asten*, 100 N. Y. 601.) Proceedings
taken under chapter 269 of the Laws of 1880 are, by the
terms of the act, as construed by the courts, assimilated to
proceedings in an action. The return is not conclusive as to
the facts set up therein, but any material issue of fact raised
by the petition, writ and return must be determined by the
court upon evidence taken, as in any cause triable by the
court without a jury. (*People ex rel.* v. *French*, 92 N. Y.
306; *People ex rel.* v. *Martin*, 142 N. Y. 352; *Hudson v.
R., W. & O. R. R. Co.*, 145 N.Y. 408; *People ex rel.* v. *Bd.
Fire Comrs.*, 106 N. Y. 257; *People ex rel.* v. *Wurster*, 149
N. Y. 550; *People ex rel.* v. *Assessors of Greenburgh*, 106
N. Y. 671; *In re Corwin*, 135 N. Y. 249, 252; *People ex
rel.* v. *Low*, 40 Hun, 176; *People ex rel.* v. *Gray*, 45 Hun,

244; *People ex rel.* v. *Curter*, 52 Hun, 458; 117 N. Y. 625.)
The order appealed from being an order based on an unani-
mous decision of the Appellate Division of the Supreme
Court, that there was evidence supporting or tending to
sustain a finding of fact by the respondents, cannot be
reviewed in this court.    (*People* v. *Purdy*, 2 Hill, 34; *Cou-
tant* v. *People*, 11 Wend. 513; *People* v. *Petrea*, 92 N. Y.
128; *People* v. *N. Y. C. R. R. Co.*, 24 N. Y. 485; *Clark* v.
*People*, 26 Wend. 599; *Szuchy* v. *H. C. & I. Co.*, 150
N. Y. 219.)

Vann, J.   The first question presented for decision is that
upon which the reargument was ordered, viz. : " Whether that
clause of the Constitution which provides that ' No unani-
mous decision of the Appellate Division that there is evidence
supporting or tending to sustain a finding of fact or a verdict
not directed by the court, shall be reviewed by the Court of
Appeals,' is applicable to this appeal."   (150 N. Y. 585.)   In
order to answer this question it is necessary to clearly under-
stand the nature of the proceeding now before us for review.
It is founded on chapter 269 of the Laws of 1880, entitled
"An act to provide for the review and correction of illegal,
erroneous or unequal assessments."   The text of the act
closely follows its title and seeks to remedy three evils that
may arise with reference to taxation by correcting assessments
that are (1) illegal for any reason, (2) erroneous because of
overvaluation, or (3)." unequal in that the assessment has been
made at a higher proportionate valuation than other real or
personal property on the same roll."   (Sec. 1.)   While the
first ground may, the second and third grounds must, involve
a question of fact.   The mode of procedure specified is by
writ of certiorari with new and unprecedented powers, author-
izing the determination of questions of fact upon further evi-
dence taken in the court of first review.   The statute pro-
vides for a return to the writ that must include copies of the
assessment roll and other papers acted upon by the assessors,
if called for, and may include "such other facts as may be

**430** People ex rel. Manhattan R. Co. *v.* Barker. [April,

Opinion of the Court, per Vann, J.     [Vol. 152.

pertinent and material to show the value of the property assessed on the roll and the grounds for the valuation made by the assessing officers." (Sec. 3.) If any one of the three evils, which it is the object of the statute to redress, appears by the return, the court has power to order the assessment, "if illegal, to be stricken from the roll, or if erroneous or unequal, to order a reassessment   *   *   *   or the correction" thereof, " in whole or in part, in such manner as shall be in accordance with law, or as shall make it conform to the valuations and assessments applied to other real or personal property in the same roll and secure equality of assessment. If, upon the hearing, it shall appear to the court that testimony is necessary for the proper disposition of the matter, the court may take evidence or may appoint a referee to take such evidence as the court may direct, and report the same to the court, and such testimony shall constitute a part of the proceedings upon which the determination of the court shall be made." (Sec. 4.) "A new assessment, or correction of an assessment, made by order of the court, shall have the same force and effect as if it had been so made by the proper assessing officers within the time originally prescribed by law for making such assessment." (Sec. 5.) Thus we have a writ of certiorari with novel functions hitherto unknown to such methods of review. The common-law writ brings up the record for inquiry into jurisdiction and regularity, and, in criminal or quasi-criminal cases, the evidence also, " to see whether, as a matter of law, there was any proof which could warrant a conviction of the relator." (*People ex rel. C. G. L. Co.* v. *Board of Assessors*, 39 N. Y. 81 ; *People ex rel. Cook* v. *Board of Police*, 39 N. Y. 506, 512, 518.) The general statutory writ brings up both record and proceedings for examination, not only as to jurisdiction and method of procedure, but also to see whether there was a violation of any rule of law, or any competent proof of all the essential facts, or a preponderance of proof against the existence of any of those facts. (Code Civ. Pro., secs. 2120 to 2148 ; *People ex rel. Coyle* v. *Martin*, 142 N. Y. 352.) The special statutory writ now

1897.]   People ex rel. Manhattan R. Co. v. Barker.   431

N. Y. Rep.]        Opinion of the Court, per Vann, J.

before us differs from its predecessors in one remarkable respect, in that it permits a redetermination of all questions of fact upon evidence, taken in part at least, by the Special Term, or under its direction. (*People ex rel. U. and D. R. R. Co.* v. *Smith*, 24 Hun, 66, 71; *People ex rel. Grace* v. *Gray*, 45 Hun, 243, 245.) As was well said by one of the learned counsel for the relator in his argument before us upon the merits, the " provision that testimony may be taken in the judicial proceeding which the act authorizes, implies that the judicial tribunal shall examine, consider and give due effect to the same in determining the question of illegality or erroneous overvaluation or other issue of fact arising upon the petition and return; in short, that the judicial tribunal shall deal with the testimony as courts deal with evidence, and not in the manner of mere administrative tribunals like a board of tax commissioners." What is called a review may thus become a proceeding in the nature of a new trial. The return is not conclusive, as in the common-law and Code writs. (*People ex rel. Miller* v. *Wurster*, 149 N. Y. 549; Harris on Certiorari, § 126.) The provisions of the Code do not apply to it. (*People ex rel. Church of H. C.* v. *Assessors*, 106 N. Y. 671.) The petition is regarded as the complaint, the return as the answer, and, in deciding the issues joined thereby, the court may call witnesses to its aid and their testimony becomes a part of the proceedings upon which the determination of the court is to be made. That determination is a revaluation and it may be a different valuation of the property assessed. Such was the method of procedure in this case. A new trial was had, somewhat like the new trial in County Court upon appeal for that purpose from Justices' Court. New evidence was taken, which, by command of the statute, the court was bound to consider in making its determination. In other words, it was the duty of the court to retry the questions of fact and decide them over again, and whether its findings were written out or left to necessary implication, there is no escaping the conclusion that the facts are conclusively presumed to have been decided *de novo*. (*Amherst College* v.

*Ritch*, 151 N. Y. 282.) Thus, the writ under consideration may be a writ of review, merely, and hence properly called a writ of certiorari, and it may be in the nature of a *venire de novo*, and utterly foreign in function to the writ of certiorari as known in the history of the law.

Let us now consider the history, nature and purpose of the constitutional provision involved and apply it to the proceeding before us.

The most difficult question before the late constitutional convention was how to relieve the overburdened calendar of this court. A Second Division of the court, organized in 1889, sat for nearly four years and afforded temporary relief, but the evil of a calendar beyond control and growing worse confronted the convention. Many plans were proposed, all of which were along the line of increasing the number of judges, or reducing the number of appeals. The latter theory was adopted and carried into effect by the second and ninth sections of the judiciary article. By the second section a new appellate court, with nearly double the number of judges, was created in the place of the old General Term, and by the ninth, the jurisdiction of the Court of Appeals was expressly limited and power was conferred on the legislature to still further restrict the right of appeal to this court. The purposes of the convention may, to some extent, be inferred from the following extracts from the report of the judiciary committee : " The Court of Appeals is overloaded with work, a very considerable portion of which is wholly outside of its proper and necessary function of settling the law. Our purpose is to draw the line distinctly around the questions which the Court of Appeals, and that court alone, ought to determine finally ; to leave all other questions to the court first reviewing the cause, and to make that court fully competent to protect satisfactorily every right of a litigant. For the purpose of effectively limiting the Court of Appeals to questions of law, we have added to the general statement of that limitation a clause specifically precluding review of a unanimous decision of the Appellate Division that there is evidence

to sustain a finding of fact or a verdict not directed by the court. This closes the door through which, under sections 993 and 1337 of the Code, the whole question of fact, in many cases, is brought before the Court of Appeals. It does not affect cases of nonsuit, or of verdicts directed, or of reversals by the Appellate Division, or cases where there is a dissent in that court. It does require that when a trial court or jury has decided that a fact is proved, and five judges in the Appellate Division have unanimously held that it is proved, controversy about that fact shall end, and that any question of law mixed with that fact shall be separately raised and presented in order to be reviewed by the Court of Appeals." (2 Convention Documents, No. 53, p. 6.) Thus we see that the purpose of the convention was to relieve the calendar of this court by confining its labors "to its proper and necessary function of settling the law." This is the great object of a court of last resort in a judicial system that allows two successive appeals, as four separate divisions of the intermediate appellate court cannot settle the law, because it is inevitable that their judgments, to some extent, will conflict with each other. The public interest requires that the law of the entire state should be uniform, consistent and harmonious, and this makes a second appeal necessary, but it is manifest from the proceedings of the convention that it was the aim of that body to limit the last appeal to the single purpose named. Did the convention accomplish its object? This question must be answered by gleaning the intention from the language of the Constitution, read, when the meaning is doubtful, in the light of such existing facts, including statutes in force at the time, as may reasonably be presumed to have been known to the members of the convention. They first provided that the jurisdiction of this court, "except where the judgment is of death," should "be limited to the review of questions of law." At first this would seem to accomplish the entire purpose as outlined above, for it would naturally exclude any review of the facts, but the Code, as it then stood, provided that an exception to a finding of fact presented a question of law as

to whether such finding was unsupported by any evidence. (Sec. 1337.) This placed it in the power of the appellant, by freely excepting to findings of fact, to compel this court to read all the evidence in order to see whether there was any to support the findings excepted to. This did not advance jurisprudence by settling the law, for its effect was limited to the case in hand, and it consumed much time in argument and examination. The convention, apparently realizing this, went farther and sought to make it certain that only " questions of law," in the ordinary meaning of that phrase, should be reviewed by this court, by providing that " No unanimous *decision* of the Appellate Division of the Supreme Court that there is evidence supporting or tending to sustain *a finding of fact* or a verdict not directed by the court, shall be reviewed by the Court of Appeals." It is important to know what was meant by the word " decision " and the phrase " finding of fact," as thus used. The word " decision "ı appears twice in the section under review, first in the quotation already made and again, but in plural form, in the next sentence, which provides that " except where the judgment is of death, appeals may be taken, as of right, to said court, only from judgments or orders entered upon *decisions* of the Appellate Division of the Supreme Court, finally determining actions or special proceedings, and from orders granting new trials on exceptions, where the appellants stipulate that upon affirmance judgment absolute shall be rendered against them." As last used, the word " decisions " obviously applies with equal force to actions and special proceedings. The meaning is, that judgments finally determining actions, and orders finally determining special proceedings, " entered upon decisions of the Appellate Division," may be reviewed upon appeals taken as of right to this court. So, as it seems to me, the word " decision," as first used, has the same meaning and applies with equal force, to actions and special proceedings. It is not confined to judgments or orders, but covers both. No reason is perceived for any distinction, and presumptively the same word has the same meaning in each of the two successive sen-

tences relating to the same subject.   This must be the true construction unless the makers of the Constitution intended to discriminate in favor of orders in special proceedings and against judgments in actions, by allowing the evidence to be reviewed in the former but not in the latter.   If any discrimination were to be made, is it reasonable to suppose that it would have been in favor of the class of least importance, or that special proceedings would have been treated as more sacred than judgments?   There is no evidence of any intention to discriminate, for actions and special proceedings are both placed on the same footing.   They are treated alike in all respects.

The phrase "a finding of fact" may mean simply a finding expressed in words or, also, a finding implied from the nature of the decision.   (*Amherst College Case*, 151 N. Y. 321.)   Both kinds were known to the law when the convention sat, for section 1022 of the Code, which was then in force, provided that the decision, upon a trial of the whole issues of fact, might separately state the facts found and the conclusions of law, or it might state concisely the grounds upon which the issues were decided, and direct the judgment to be entered thereon.   The latter kind was similar, both in form and effect, to the general verdict of a jury, and commingled fact and law in the same way.   We have recently held that all the facts warranted by the evidence and necessary to support the judgment, are presumed to have been found by a decision that does not state the facts.   (*Amherst College Case, supra.*)   The legislature, as the convention is presumed to have known, had done away with findings of fact, absolutely, as formerly made upon request, and in all cases, as a matter of right, yet with this knowledge, it used language that applies with equal force to all findings of fact made by courts or referees, whether written out in words or not, the same as it applies to all findings of fact made by a jury, whether general, without expressing the facts, or special, by expressing them in full.   It cannot be that the legislature, by prohibiting express findings of fact, could practically abolish the constitutional provision in question, yet this would be possible, unless it applies to implied

findings, as well as those written out *in extenso*. In view of the primary object of the judiciary article to confine this court to the great duty of settling the law, and to give it time to do the work well, I think that the convention used the phrase " finding of fact " in no narrow or technical sense, but with the broad and liberal meaning which, alone, would accomplish its important purpose.

The action of the legislature in so amending the Code of Civil Procedure as to carry the judiciary article into effect, has some bearing on the question   By section 190 it confined the jurisdiction of this court to the review upon appeal of actual determinations made by an Appellate Division, as expressed in judgments or orders finally determining actions or special proceedings, and orders granting new trials on exceptions. It thus treated actions and special proceedings alike, the same as it did in the following section, which relates to limitations, exceptions and conditions. It expressly limited the jurisdiction to the review of questions of law, and repeated the language of the Constitution in reference to the effect of a unanimous decision of the Appellate Division in relation to the facts. (*Szuchy* v. *Hillside Coal and Iron Co.*, 150 N. Y. 219, 223.) Of necessity, " the actual determination " referred to in section 190 has the same meaning as the " decision " of section 191. Both refer with equal force to actions and special proceedings, without discrimination in favor of or against either form of decision or determination. The phrase " finding of fact " is repeated from the Constitution, and obviously refers to both kinds of decisions authorized by section 1022. The reasoning of the court in *Otten* v. *Manhattan Railway Co.* (150 N. Y. 395, 399), as to the effect of the same word, when used in the Constitution and a statute, applies with greater force to the same word or phrase when used a second time in the same statute. As neither the Constitution nor the statute confines the findings of fact to judgments, we have no power to do so.

To the construction thus indicated, the objection is made that it would preclude the separation of questions of law from

1897.] People ex rel. Manhattan R. Co. *v.* Barker. 437

N. Y. Rep.] Opinion of the Court, per Vann, J.

questions of fact, when the findings of fact were implied or general in form. That, however, is a mere matter of practice, to be worked out by the legislature, which can prescribe a method, whenever it is deemed necessary, of separating the facts from the law. It is clearly within the domain of legislation to provide that the facts found shall be expressed in words, or to so regulate the practice that questions of fact and law will not be commingled. The fact that it has not yet done so has no bearing upon the question under discussion.

But whether the constitutional provision in relation to the effect of a finding of fact, unanimously affirmed by the Appellate Division, applies to all special proceedings or not, there are particular reasons why it should be held to apply to the special proceeding now under consideration. The method of procedure in this matter, when it reached the Special Term, did not differ in substance from the trial of an action commenced by a summons and the decision of the issues without expressing the facts found, as permitted by section 1022 of the Code. There was, in fact, a trial of the issues framed by the petition and the return. Witnesses were sworn and examined, and the testimony taken was considered by the court in making its determination. Thus, the analogy of this special proceeding to an action is perfect, and the facts impliedly found under such circumstances come, as we think, within the constitutional provision in question. No confusion should arise from the name given to the proceeding by the statute which authorizes it, for the substance or real nature of the procedure should have more weight than the name applied to it. While the proceeding is called a certiorari it is not within the lines of that writ as ordinarily used, because it permits a new valuation upon new evidence, which is, for all practical purposes, a new trial. The object was not simply to see whether an inferior tribunal had kept within the bounds of its authority, but to make a new determination as to the value of the assessable assets of the relator.

The claim is made that there was no decision by the Appellate Division, unanimous or otherwise, that there was evidence

supporting or tending to sustain a finding of fact. This requires brief consideration, for we have already held, although no public announcement has been made of the fact, that the effect of a unanimous judgment or order of affirmance is a decision that there is evidence supporting the findings of fact as expressed or necessarily implied. We do not think it is necessary for the Appellate Division to specify what findings of fact are sustained by evidence, when it intends to sustain them all. Such a course would make its decision cumbersome and inconvenient. Nor do we regard it as necessary for that court to repeat the language of the Constitution and apply it generally to all the findings of fact. A unanimous affirmance of the judgment or order appealed from necessarily affirms all the findings of fact, whether expressed or not, that are essential to support the decision made below, the same as the affirmance of a general verdict. No other logical inference is possible. · That the vital facts exist is a necessary part of the determination, for unless they existed it could not have been made. Neither the statute nor the Constitution say an express finding of fact, but simply a finding of fact, thus meaning any, and including all findings of fact.

It is our duty, therefore, to accept the facts stated in the return as final, and in our further review of the proceeding to ascertain whether, upon the basis of those facts, the assessment in question is illegal for any reason. It appears from the return that the assessment was founded upon the report made by the relator to the railroad commissioners in January, 1895. Such a report, as suggested by this court in another case between the same parties, is " competent evidence for the commissioners or the Special Term to receive and act upon," as in the nature of an admission made by the relator. (*People ex rel. Manhattan R. Co.* v. *Barker,* 146 N. Y. 304, 316.) By that report, in the language of the return, " the relator itemized its total gross assets and fixed them at the sum of $72,787,217.13," and upon examining the items that make that aggregate the following appears: " Cost of lease, $14,014,000." It appears from another part of the return

that the original issue of capital stock by the relator was $13,000,000, of which one-half went to the stockholders of the New York Elevated Railroad Company in payment for the lease of its line to the relator, and the other half to the stockholders of the Metropolitan Elevated Railroad Company for the like purpose. In addition to this issue of stock the relator discharged certain obligations by cash payments to said two railroad companies amounting to the sum of $1,014,000, thus making the total cost of the leases $14,014,000. The lease of a line of railroad necessarily includes the use of the franchise of the company owning it, for without it the lessee would have no right to operate the road. It is that which authorizes the use of the streets for the erection of the permanent structure and the operation of trains thereupon. The cost of the lease, therefore, embraces the value of the use of the franchise during the period of the lease, and an assessment based in part upon the cost of the lease is based in part upon the value of the franchise. Some years after the making of these leases an agreement of merger was entered into by the three companies, and in pursuance thereof more capital stock was issued by the relator and a portion of it divided between the stockholders of the other two companies. In 1891 the Suburban Rapid Transit Company was leased and merged with the relator. No amount was paid separately for the structures of the constituent roads, but by the leases and the agreements of merger the relator apparently acquired their entire property, franchises included. Whether the relator is regarded as lessee or owner in fee, it is evident from the return that the item of $14,014,000 for the " cost of lease," of necessity embraces to some extent the value of the franchise. Under the act in question, however, franchises cannot be valued or included in the assessment, as they are taxed under another statute. (*People ex rel. Union Trust Co. v. Coleman*, 126 N. Y. 433; *People ex rel. Manhattan R. Co.* v. *Barker, supra.*) The value of the franchise should, therefore, have been deducted before the assessment was made, or the valuation should have proceeded upon a basis that did not include the franchise.

The order of the Appellate Division should be reversed and that of the Special Term so modified as to vacate the assessment and order a reassessment by the commissioners, without costs to either party.

O'Brien, J. The first question suggested by the argument is whether this case falls within the restriction upon appeals to this court, which has been embodied in the present Constitution. This provision of the fundamental law was framed by members of the bar, in brief language, and every word employed was in common use in the profession and had a well-settled and definite meaning. The restriction is embraced in a single sentence :

" No unanimous decision of the Appellate Division of the Supreme Court that there is evidence supporting, or tending to sustain, a finding of fact or a verdict, not directed by the court, shall be reviewed by the Court of Appeals."

It is obvious that this language embraces the class of cases and the questions that were intended to be withdrawn from the jurisdiction of this court. The cases were those where there was a finding of fact or a verdict, and the questions were whether there was evidence supporting or tending to sustain such finding or verdict when that question had been passed upon in the Supreme Court in a decision which was unanimous.

It is said that there is in this case a finding of fact against the relator, and that the court below, having decided unanimously that there was evidence supporting or tending to sustain it, the decision is final. It will be observed that the record before us does not disclose the existence of any action or special proceeding instituted by any private litigant. The controversy originated in the acts of public officers in the discharge of public duties. The jurisdiction which this court has always possessed and exercised to review the official acts of public officers and administrative and governmental boards and bodies, should not be abdicated by the court itself, nor should suitors be denied a hearing except in obedience to the

plain mandate of the Constitution. The acts which those officials may perform affect rights and interests of the citizen of vast consequence, and the powers which they may exercise are so liable, through mistake of law or otherwise, to result in oppression or injustice, that appeals from their proceedings frequently present the most important questions that can engage the attention of any court. They practically have charge of nearly all the machinery of government, both general and local, and their acts at almost every point affect liberty and property to such an extent that it may well be doubted whether it would be wise to withdraw them from the most complete judicial review. Certainly it would not by any close, strained or doubtful construction of the language of the Constitution.

If this case is not fully within our jurisdiction, it is difficult to see how any case originating in like official acts ever can be, since the objections to that jurisdiction now made must exist in every such case. The particular question now before us grows out of the determination of a board or body of officers that exist in every town, village and city of the state. They are charged with most important duties and exercise most extensive powers. In the city of New York, where this controversy arose, they are known and designated by a different title, and their proceedings assume more of the forms that pertain to a regular judicial body, organized for a special purpose, but in every locality of the state their powers and duties are essentially the same. They have power to decide important questions of fact and law involved in the valuation of property and the imposition of taxes, and, since the questions under consideration affect every locality, I prefer, in the course of the discussion, to use names and terms that are familiar, convenient and generally known, and, at the same time, sufficiently describe the officials who discharge the duties, in the city of New York, of ascertaining the facts and preparing the lists that form the basis of all public taxation, whether general or local.

There can be no doubt that the intention of the framers of the Constitution was to restrict appeals to this court, and whenever that intention is fairly expressed, with reference to the particular case, this court will not attempt to draw to its jurisdiction cases that come, plainly or even by reasonable construction, within the restriction. But the right to appeal to this court has never been regarded as such a public mischief as to warrant us in extending the restriction, by construction, to cases not fairly embraced within the language or the evident intention of the framers. The restriction clearly applies only to a case where there has been a finding of fact or a verdict, and, if we can but ascertain the precise thought sought to be expressed by the use of these words, the present contention will be determined. The words, when used, had a well-settled and well-understood meaning, both in common language and in legal phraseology, and it must be assumed that they were not used in any loose or artificial sense, but in their natural and ordinary meaning. In practice they have always been used to express the result of the decision or the deliberation of a court or jury upon an issue or question of fact involved in some litigation. (Burrill's Law Dict., Bouvier, Black, Webster.) The words always presuppose an issue of fact between litigants.

It is said that in this case there was such an issue, that some fact has been determined and that the court below has decided unanimously that such fact is sustained by evidence, and that the decision so made is final and beyond the power of this court to review. In my opinion, this contention is not correct within the true intent and meaning of the Constitution, and, in bringing it to the proper test, it is of the first importance to be able to point out clearly what the supposed fact is, and when and how decided.

On or prior to the second Monday of January, 1895, the board of assessors of the city of New York made certain entries in a book or public record prepared and kept for that purpose, and required by law. The book was divided into columns, each with the appropriate heading, and is known as

1897.] People ex rel. Manhattan R. Co. v. Barker. 443

N. Y. Rep.]             Opinion per O'Brien, J.

an assessment roll. The words, characters and figures entered in the several columns of this book, in themselves, express no distinct or intelligible idea, but, when read with the law which authorized these officers to assess and levy taxes, they possess great significance, and are the evidence of an official act in the exercise of the highest authority. In law this entry denotes that the assessors decided at least two important facts, namely, that the relator resided within the jurisdiction and owned property subject to taxation of the value specified. The decision was made *ex parte* in the discharge of an official duty. There was no issue, no litigation, no proofs, but the officers acted upon their own personal judgment, aided by such inspection of the property and such inquiries as they thought proper and necessary to make, and yet this decision was in accordance with all the forms of law. There was jurisdiction of the person and of the subject-matter, and this entry is the only original decision of fact or law that is to be found in the record. The facts thus determined are at the foundation of this whole proceeding, and every step since taken has had but one purpose, and that was to change or modify the facts so found. This entry is the only adjudication to be found in the record as to the facts, and, if it was stricken out, the case would disclose no fact decided, no legal liability on the part of any one, and the relator would have no grievance. There is no other paper in the record that makes any original determination of any fact whatever. This entry denotes that facts of great importance were passed upon by the assessors, and the record shows that these facts have been since reviewed in various forms by other tribunals, but the assessors alone constituted the court of original jurisdiction that tried and decided the questions in the first instance, and it is of this decision, and this alone, that the relator complains. The decision thus made was not final, however, in cases where complaint was made, but subject to review by the assessors themselves. The law required that at a subsequent time, and upon notice to the parties in interest, the assessors should organize as a board of review to examine their work, hear parties aggrieved, and cor-

rect any error that had been committed. Their powers in this respect were limited. They could reduce the value, as originally fixed, but they could not increase it. They could correct manifest clerical errors in extension and computation, and then the power to interfere with the decision before made by them practically ended. In this case they reduced the valuation, and their original decision, as thus modified, stands as the final decision.

The body possessing original jurisdiction had then decided all the questions of fact and law that have ever been involved in this controversy, and the relator has ever since been seeking to change that decision by an appeal to the courts from the action of the assessors. Courts have no power to make assessments or to determine facts upon which they are based, though they have ample power to review them when made by the assessors, but the latter clearly possess the primary or original jurisdiction over the subject. It is important to keep clearly in view the point that the only evidence in the record of an original determination of facts is the entry by the assessors in the book. If anything is wanting to make that clearer, it is only necessary to look into the subsequent proceedings in the courts.

The first step in that direction on the part of the relator was to sue out a writ of certiorari, under chapter 269 of the Laws of 1880. The purpose of that writ, as plainly expressed on the face of the statute, was to review the decision of the assessors and to determine whether that decision was right or wrong. The proceeding differed from other appeals only in the method of review, since it is provided that in certain cases additional proof may be taken to aid the court in the disposition of the appeal. Whether the hearing is had upon the record of the assessors, as it may be, or upon further proof, the court is all the time reviewing the decision of the assessors. It can make no original or independent decision. It cannot act upon the parties, but only upon the assessors, by directing them to correct their own errors, if any are found. It is only where all the evidence is not produced before the assessors

that the court, in the exercise of discretion, permits further proof to be taken. That is a mere method of hearing the appeal that does not change the real character of the proceeding as one solely to review the action of the assessors.

The order which the court made in the decision in this case, of the questions brought before it by the writ, clearly indicates the nature and character of the whole proceeding. It does not profess to determine any fact, and no fact is even stated in it. It simply confirms the action of the assessors and directs that the writ brought to review their decision be dismissed. No one can tell, from reading the order, what the fact in controversy was. A court which does nothing more than affirm the action of some other court or body and dismiss the appeal, does not make any finding of fact or render any verdict within the meaning of the Constitution. The Special Term did precisely what the Appellate Division did. It reviewed the action of the assessors. The method of review was different, but neither court exercised original jurisdiction or made any finding of fact. Both sat in review of the action of the assessors. A finding of fact in the proper sense always proceeds from a court or body having original jurisdiction over the subject, and since the courts have no original power to make assessments, but simply to review them when made by the assessors or other officers, the original decision upon the facts in this case must be referred to the assessors and not the courts.

It is not and never was the office of the writ of certiorari to initiate any original suit or proceeding in which a finding of fact, in the proper sense, could be made. Its office is to bring up for review some decision already made. The questions to be reviewed have been enlarged and the methods and procedure changed by statute, but it is still essentially a proceeding for the correction of an erroneous decision, and the writ is generally discretionary. The decision upon this writ is an order that acts upon the court or body below that has made the decision, but it is not an original determination of any controversy. It deals with facts as all appellate courts deal with them. It uses them for the purpose of determining whether

the assessors were right or wrong. Certainly such an order was never known as a finding of fact, and to call it such in this case is to give to the words of the Constitution a very loose construction.

I have dwelt at some length upon the nature and origin of the decision in this case, because it seemed to me to be useful, since it clears the way for a distinct and accurate statement of the precise question we have in hand, and enables us to anticipate the answer. When the framers of this amendment to the Constitution made use of the words " a finding of fact," did they intend to include in the term or did they refer to an entry made by assessors in a book in the discharge of their duty and for the purpose of recording their decision as to the value of property for the purpose of taxation?

The answer to this question ought not to be very difficult. It seems very plain to me that the language of the restriction had no reference whatever to such a decision. The natural and obvious thought that the words express is, as already stated, the result of a judicial inquiry upon an issue of fact joined in some litigation, and not the result of an official entry by an officer like an assessor. The words employed had long been in general use and were familiar to the bar and the public, and yet, I think, it is safe to assert that no member of the convention had ever heard such an entry by assessors, upon the roll, described as a finding of fact. No one who would attempt to describe or designate such an official act as a finding of fact could make himself understood by either lawyer or layman. It is more than probable that no member of this court, or of the courts through which this case has passed, has ever, before this discussion was brought to his attention, heard an entry in a book by assessors, for the purpose of an assessment, designated as a finding of fact.

The effect of many official acts of officers and governmental or municipal boards is to determine some fact, but such acts have never been known as findings of fact, and cannot properly be expressed by the use of such terms. The expression, as used in the Constitution, can be given full effect and a very

1897.] People ex rel. Manhattan R. Co. *v.* Barker.  447

N. Y. Rep.]          Opinion per O'Brien, J.

wide application without such an extreme and unnatural construction. When it is applied to a case where an issue of fact was joined between parties in a court of original jurisdiction, and determined judicially by a decision, general or specific in its terms, we have pushed the restriction as far as the framers of the Constitution ever intended.

There never was a time when, if it was said that assessors had made a finding of fact, that the common mind, or even the professional mind, would have comprehended the precise meaning intended to be conveyed, and certainly no one would suppose that such an expression had reference to the formalities necessary to make an assessment. Nor is there any reason to believe that an order of the Special Term, such as appears in this record, confirming the action of the assessors and dismissing the writ of certiorari, was ever known as a finding of fact or that the members of the convention who drafted the amendment intended to refer to such an order or include it within the limitation.

To say that there is in this case a finding of fact is to give to these words a meaning and signification that they never before possessed. All that the case shows is that certain officers performed an official act which affected the relator and assumed certain facts, but it contains no finding of fact within the meaning of the Constitution or in the usual and ordinary sense in which that expression is used.

In *Riggs* v. *Palmer* (115 N. Y. 506), this court approved and applied that very rational test for ascertaining the meaning of statutes which is found in Bacon's Abridgment and in other works of the highest authority. It is stated in these words:

"In order to form a right judgment whether a case be within the equity of a statute, it is a good way to suppose the lawmaker present, and that you have asked him this question, Did you intend to comprehend this case? Then you must give yourself such answer as you imagine he, being an upright and reasonable man, would have given. If this be that he did mean to comprehend it, you may safely hold the case to

be within the equity of the statute, for, while you do no more than he would have done, you do not act contrary to the statute, but in conformity thereto."

The fairness and good sense of this rule cannot be questioned. In its application to this case, we may now suppose the judiciary committee that framed the amendment to the Constitution and reported it to the convention to be present, and that we have submitted to them the following questions: Did you intend that a decision of assessors, entered upon the roll, should be deemed to be a finding of fact within the meaning of the restriction upon appeals to this court? Did you intend to call the order of the court, affirming the assessors and dismissing the writ, a finding of fact within the meaning of the restriction? Did you intend that official acts of public officers, boards or governmental bodies, that necessarily determine some fact, should be deemed to be a finding of fact within the meaning of the restriction? If these questions could properly be answered in the affirmative, then, of course, I must be radically wrong upon this question.

There can be little doubt, however, what the answer to these questions would be. The committee has given it already. In the report to the convention, which accompanied this proposed amendment to the Constitution, they stated the purpose and effect of the change in this language: "For the purpose of effectively limiting the Court of Appeals to questions of law, we have added to the general statement of that limitation a clause specifically precluding review of an unanimous decision of the Appellate Division that there is evidence to sustain a finding of fact or a verdict not directed by the court. This closes the door through which, under sections 993 and 1337 of the Code, the whole question of fact in many cases is brought before the Court of Appeals." (2 Conv. Doc. No. 53, p. 6.) It is seldom that a law-making body has made such a clear and concise statement of heir purpose and the effect of the change which they had in view. The committee told the convention and the people who were to pass upon their work that the new provision was intended .

1897.] People ex rel. Manhattan R. Co. v. Barker. 449

N. Y. Rep.]                    Opinion per O'Brien, J.

to close the door against certain practices that existed under two designated sections of the Code. We know what these practices were. They had no relation to special proceedings, and when the scheme of the Constitution was put into effect by the legislature one of the sections was repealed and the other so changed as to have no reference whatever to such proceedings, all of which proves that there never was any intention to bring such cases as this within the scope of the restriction.

If the committee had in mind any such sweeping changes in the jurisdiction of this court in cases of appeals in special proceedings as are now suggested, it is quite remarkable that they made no mention of such purpose in their report. It is apparent that if the change has been made, neither the committee nor the convention were aware of the scope of their work.

It is easy to see how such a contention with respect to jurisdiction can be made in every special proceeding, and hence the decision that we are about to render may be fraught with the most momentous consequences. It is only necessary to mention the case of a board of election officers acting as canvassers of the vote. It may be composed of the inspectors of election, or the board of supervisors, or the state officers acting as a state board of canvassers. From beginning to end, the inquiry is with respect to the number of votes cast for this or that candidate. That is an inquiry as to a matter of fact in the same sense that the value of the relator's property was in this case. By mistake of law or fact, a person may be declared elected to an office when he was not elected. The mistake or error may affect the control of the state government or even the Federal government, and yet the unanimous decision of the Supreme Court that there was evidence to sustain the finding of fact is final.

The state board of equalization, composed of the state officers and state assessors, adjust and equalize assessed values in every county of the state. The only evidence of its decision is a table in which the values are expressed in figures, and these

57

decisions have always been subject to review by certiorari, although the board deals with nothing but facts. To say that the decision of such a board, whereby the assessed valuation of one county was increased by millions of dollars and that of another county reduced correspondingly, when made without evidence of any kind, cannot be reviewed here, when the Appellate Division unanimously affirms, is to pervert the language of the Constitution. There is no finding of fact in such a case within any possible meaning of the words, and to impute to the framers of the Constitution an intention to designate such a table by such words is to cast a doubt upon their ability to give appropriate expression to their thought.

This court has just decided a case which cannot be reconciled with the view that jurisdiction in this class of cases has been withdrawn from the court by the terms of the present Constitution. I refer to *In re Fairchild* (151 N. Y. 359), which was a special proceeding, substantially identical in form with this.

In that case the controversy originated in the action of the secretary of state in filing a certificate of a party nomination and refusing to file another certificate, and the court, at Special Term, did what has not been done in this case. It made an express finding that a certain candidate had been nominated and that a certain other candidate had not. It was plainly the determination of a fact. The order was affirmed at the Appellate Division unanimously, and that decision could mean nothing if it did not mean that there was evidence to sustain the finding of fact, and yet we reviewed and reversed both orders in this court on the facts found, as well as the law. Much more could be urged against the contention now proposed to be put upon the Constitution by reference to adjudged cases and to numerous provisions of the Code, in which the meaning of the restrictive words are very clearly indicated and used in the sense that I have stated. But if we were to enter that field the discussion would be unnecessarily extended. It is quite sufficient to say that neither in any statute nor in any adjudged case, have the words " a finding

of fact" been used in the sense now sought to be attached to them. I repeat that the court should not abdicate the jurisdiction which it has always maintained over this class of cases and with which it has been invested by the people through the Constitution, upon such an unwarrantable construction as to the meaning of a single expression. It is quite unreasonable, if not impossible, to suppose that the framers of the amendment to the Constitution could have had any reference to a special proceeding like this, where the facts and the law are so commingled in the decision that the question upon which it turned cannot be pointed out or identified, and where there is no method known in the practice for separating the law from the facts. There is a wide field of litigation where that can be done, and there the restriction can have full effect and can fulfill every purpose that the framers of the Constitution had in view. In such a case as this a finding of fact in the ordinary, or even in the professional sense in which these words are used, is a practical impossibility.

Special proceedings, originating in the official acts of public officers, whose functions are principally ministerial or administrative, differ widely from actions at law or in equity in their nature and character. In the latter the issues between the parties, whether of law or fact, are distinctly marked by the pleadings, and every fact determined may be specifically stated in the decision, or, if not so stated, can readily be separated or extracted from the general result. There is no difficulty in applying the words of the restriction in such cases.

Not so with the former. There is no distinct issue that can be identified by any pleading. There are no facts found in any fair sense. The facts, if any are involved in the act, can only be constructively known or formulated from the nature and character of the act itself and from the result, and it never can be said with any degree of certainty that the officer, when he performed the act, was even conscious of having determined any fact or of the nature of the fact involved. Therefore, it would be an unreasonable construction of the Constitution to impute to the convention an intent to describe anything con-

structively decided in such a proceeding as a finding of fact. There is an appropriate place in legal proceedings for such an expression, but to apply it to cases of this character is to pervert its true meaning and to misapply the purpose and policy of the organic law.

In my opinion, there is nothing in the language of the Constitution nor in the general purpose which the convention had in mind to warrant the conclusion that cases of this character have been withdrawn from the scrutiny of this court. So, I think, we have jurisdiction to review the order in the same way and to the same extent that such orders have always been reviewed here.

But, quite apart from this question, there can be no doubt with respect to the power of this court to review the decisions of the courts below when the record shows that the assessment is based upon principles that are erroneous in point of law. I think that the return of the assessors to the writ of certiorari shows that the assessment and the valuation of the relator's property was made upon principles contrary to the rules of law applicable in such cases and which this court has applied in a recent case between the same parties. (*People ex rel. M. R. Co.* v. *Barker et al.*, 146 N. Y. 304.)

The controversy is wholly with respect to the value of the relator's personal property or, as it is designated in the statute, the capital stock and surplus profits. The real estate, which embraces all its structures, was assessed at $15,910,900. There is no controversy here about that. The valuable franchises are not supposed to be included in the assessment at all, since they are taxed under another law. (Laws 1881, chap. 361.) The personal estate was assessed at $16,496,995. The question is whether these figures are, upon the facts appearing in the return, the result of erroneous methods of valuation. The bonded debt is conceded to be $37,164,019.10, and the capital stock, as indicated by the face value of the shares, $30,000,000. The authority for the assessment is the following provision of the statute:

" Sec. 3. The capital stock of every company liable to taxa-

tion, except such part of it as shall have been excepted in the assessment roll, or as shall have been exempted by law, together with its surplus profits or reserved funds, exceeding ten per cent of its capital, after deducting the assessed value of its real estate, and all shares of stock in other corporations actually owned by such company, which are taxable upon their capital stock under the laws of this state, shall be assessed at its actual value, and taxed in the same manner as the other personal and real estate of the county." (L. 1857, chap. 456, sec. 3.)

The thing to be valued and taken was, not the shares of stock, but the capital, that is, the money, or visible, tangible, taxable property in which it was invested, or by which it was represented. (*People ex rel. U. T. Co.* v. *Coleman,* 126 N. Y. 433.)

The relator submitted proof as to the value of every item of personal property that it possessed which was subject to taxation. There was really no conflict on that point, and if the proof had been accepted by the assessors it must be conceded that the assessment made was not justified.

Without stopping to consider how far this proof was binding upon the assessors, or what property, if any, subject to taxation and representing capital stock, it disclosed, I will attempt to point out in as brief terms as possible the principle upon which the assessors proceeded in arriving at the result which they did. It is not difficult to do that, since it has been very clearly set forth by the assessors themselves in the return to the writ of certiorari. Their counsel put in evidence before them the report required by law to be made by railroad companies to the railroad commissioners, and which was made by the relator for the year ending on June 30, 1894. This was treated by the assessors as a declaration or admission by the officers of the company as to the amount, nature and value of all its property. From this report the assessors found the total gross assets of the company to be nearly seventy-three million dollars, and, after deducting debts, found that the relator was possessed, at the time of the report, of actual tangible assets in the sum of $35,623,197.38, and, after deducting the

assessed value of real estate and ten per cent on the capital stock, they decided that the relator had personal property subject to taxation of the value expressed in the assessment. Without attempting to be precise in the figures used, this sufficiently indicates the principle upon which the result was obtained. But this report contained one item of over fifty million dollars that indicated nothing but the cost of the road, some twenty years before, with the cost of such additions and betterments as had been made. It was shown, and on this point there was no dispute whatever, that it was not the cash cost, but the cost in stock and bonds sold at an enormous discount. This discount alone, which, of course, represented nothing, was over six millions. There was also included in the item over eight million dollars, paid as damages to abutting owners of land. This sum represented no property whatever, but was paid in order to remove a legal obstacle to the exercise of the franchise. The easements of light, air and access for which this sum was paid were of only nominal value, and the expenditure may be regarded as made to remove or extinguish an incumbrance upon the franchise to operate a railroad. Apart from the franchise, which could not have been considered, this item represented no element of actual value. In the report of the gross assets to the railroad commissioners is another item of over fourteen million dollars, which was paid by issuing stock to other railroad corporations in the city of New York which had been leased to the relator, and this stock was issued to them for the purpose of extinguishing the lease, acquiring their franchises to operate railroads in the streets, and to merge their privileges and rights in the relator. The company had no actual tangible property on hand, except the real estate assessed, to represent the stock so issued, and so far as it represented things intangible, as privileges and franchises, they could not be considered.

The principle of valuing the relator's property upon the admissions of such a report, accompanied as they were by these explanations, was erroneous. The assessors could consider everything that had a legitimate bearing upon the actual

1897.] People ex rel. Manhattan R. Co. *v.* Barker. 455

N. Y. Rep.] Opinion per O'Brien, J.

value of the relator's property at the time, but to decide that the property was worth what was stated in the report, because the officers had said it cost that sum, and to ignore all other proofs on that subject, was to adopt a method of ascertaining value that cannot be defended upon any legal principle.

They assumed, as a fundamental fact, that the gross assets of the relator amounted to seventy-three millions since that sum had been expended upon the property many years ago. The cost of property at some remote period of time is not the legal rule for estimating the present value in any case; but when it is shown, without dispute, that nearly thirty millions of that cost is not now represented by any tangible property subject to taxation, and never was, in fact, it is legal error to adopt the cost of the property made up of such items as the rule of valuation.

Moreover, the report was not intended by the law, or by the officers who made it, to evidence the then value of the property, but simply to state the facts with respect to the cost of the road, and such cost, made up in the manner stated, could not properly have been regarded by the assessors as controlling proof of value. It is impossible, I think, to carefully consider the assessors' return, in which they set forth the principles upon which they arrived at the value of the property, without reaching the conclusion that they included in the estimate the valuable franchises possessed by the relator.

This is quite clearly indicated by another statement in the return, to the effect that they had ascertained that the relator's operations, after defraying all fixed charges, yielded a profit in the form of dividends, and from this they concluded that the capital stock was unimpaired and represented actual taxable property equal to the face value of the shares.

This reasoning, I think, involves an erroneous principle. The business success of a corporation, as indicated by profits or dividends, does not prove that it has property equal to the face of its capital stock. It does prove, or tend to prove, the earning power of the company, which is quite another thing. That may be due to the skill and ability of the management,

and in many cases to the possession of privileges and franchises. It cannot be doubted that the franchises of this company, which are represented by the capital stock, constitute an important element in its earning capacity It is impossible to treat this case in the various phases in which it has been presented in the arguments of counsel, and which have great weight and force in the process of reasoning, by means of which the proper result is established. I have not referred to the fact that there does not appear to be any property to represent the so-called surplus of over five millions. It was a mere device of bookkeeping, but the company have no tangible property to show for it. It is only necessary to repeat that the return shows that the assessors adopted the report to the railroad commissioners as the guide and fundamental rule of evidence which was to control and did govern their action. It was, under all the circumstances, misleading, unreliable and plainly productive of a result that appears to be unjust and contrary to law. The assessment upon the personal property cannot be evolved from the facts and figures in the record without either changing the assessed value of the real estate or including the franchises, a method of valuation which the law does not permit.

The order appealed from should be reversed and the proceedings remitted to the assessors for further action.

Bartlett, Haight and Martin, JJ., concur with Vann, J., for reversal; Andrews, Ch. J., and Gray, J., vote for reversal on the ground that improper evidence was considered by the tax commissioners in making the valuation of relator's property and formed the basis in part of the assessment. O'Brien, J., reads for reversal.

Order reversed, etc.